AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia

F I L E D

FEB 1 1 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with the email accounts<br>HULLAH@USAGM.GOV and HULLAH@BBG.GOV<br>stored at premises controlled by USAGM | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 1:19-sw-88

UNDER SEAL

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 287 | Submitting False Claims |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Lisa Warffeli, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **FEB. 11, 2019**

/s/
John F. Anderson
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

JOHN F. ANDERSON, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following email account:

**hullah@usagm.gov (formerly hullah@bbg.gov)**

which is stored at premises controlled by USAGM, a government agency headquartered at 330 Independence Avenue SW, Washington, D.C. 20237.

## **ATTACHMENT B**

### **Particular Things to be Seized**

I.    **Information to be disclosed by USAGM ("USAGM")**

For the account listed in Attachment A, to the extent that the information described in Attachment A is within the possession, custody, or control of USAGM, including any e-mails, records, files, logs, or information that has been deleted but is still available to USAGM, or has been preserved since approximately October 30, 2018, USAGM is required to disclose the following information to the government for the period of account inception to the present:

a.    The contents of all electronic communications associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, files, all attachments to emails and other communications (including the native files), the source and destination addresses associated with each communication, all email header information, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All device information associated with the account;

e.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, chat lists, calendar data, pictures, and files;

f.     All records pertaining to communications between USAGM and any person regarding the account, including contacts with support services and records of actions taken.

g.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of wire fraud (18 U.S.C. § 1343), aggravated identity theft (18 U.S.C. § 1028A), and false claims (18 U.S.C. § 287), involving HAROON K. ULLAH and any other co-conspirators, including, for the email account listed on Attachment A, information pertaining to the following matters:

a.     The email and information will contain evidence that ULLAH is involved in defrauding the United States through the submission of fraudulent vouchers, falsified supporting invoices, receipts, and letters, as described in the Affidavit in support of probable cause. The account will contain evidence of communications between ULLAH, USAGM, and third parties in furtherance of his wire fraud, false claims and identity theft schemes;

b.     Information relating to templates, receipts, communications, logos, photos, bitmap files, and other fragments of documents and document history showing the preparatory steps ULLAH took to create false documents;

2

c.      Information relating to the use of the criminal proceeds, the creation and maintenance of financial accounts, financial transfers and transactions, the possession of monetary instruments, the disbursement of funds;

d.      Information related to hotel invoices and/or reservations, travel plans, taxi receipts, ridesharing receipts, airline tickets, airline receipts, vehicle rental agreements, or other documents pertaining to any airline U.S. or foreign-based;

e.      Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts;

f.      Evidence indicating the email account holder's state of mind as it relates to the crime under investigation;

g.      Information that would link the email account to other email accounts controlled by the subscriber;

h.      Evidence indicating how and when the email account was accessed and used, including IP logs, passwords, geo-locational information or other records that will help establish the location of the account user.

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FILED

FEB 11 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| INFORMATION ASSOCIATED WITH ) | |
| THE EMAIL ACCCOUNT ) | Case No. 1:19-sw-88 |
| **HULLAH@USAGM.GOV**, and ) | |
| **HULLAH@BBG.GOV** ) | |
| THAT IS STORED AT PREMISES ) | UNDER SEAL |
| CONTROLLED BY THE U.S. AGENCY ) | |
| FOR GLOBAL MEDIA ) | |
| _____ ) | |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Lisa Warffeli, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain email account, **hullah@usagm.gov**, formerly identified as

**hullah@bbg.gov** (herein collectively referred to as the **"TARGET EMAIL ACCOUNT"**) that

is stored at the premises controlled by the U.S. Agency for Global Media (USAGM), a

government agency located at 330 Independence Avenue SW, Washington, D.C. 20237.

USAGM assigned the **TARGET EMAIL ACCOUNT** to Haroon K. Ullah ("ULLAH"), a

member of the senior executive service and a top official at USAGM, as discussed further below.

The information to be searched is described in the following paragraphs and in Attachment A.

This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§

2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require USAGM to disclose to the government

copies of the information, including the content of communications, further described in

Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      Although **hullah@usagm.gov** and **hullah@bbg.gov** are government email addresses and both are controlled by a government agency, I seek this search warrant out of an abundance of caution should ULLAH ever assert he had a reasonable expectation of privacy when using his government email account.[1]

3.      Although he also co-owned a condominium in the District of Columbia with his sister, I believe that ULLAH resided in the Commonwealth and Eastern District of Virginia during the course of this scheme. I have reason to believe that ULLAH caused the transmission of interstate wires in and through the Eastern District of Virginia in furtherance of his scheme, involving banking, telephonic and other wire transactions.

4.      I am a special agent with the U.S. Department of State ("DOS"), Office of Inspector General ("DOS OIG") and have been so employed since January 2017. Prior to employment with DOS OIG, I was a special agent for the U.S. Department of State's Bureau of Diplomatic Security for approximately ten years. Prior to becoming a special agent, I practiced law in the Commonwealth of Virginia. In 2007, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia and the Bureau of Diplomatic Security's Basic Special Agent Course in Dunn Loring, Virginia. My current

---

[1] The banner which appears upon logging into the USAGM computer system reads as follows: "—WARNING—This system is for the use of authorized users only. Individuals using this computer system without authority or in excess of their authority are subject to having all their activities on this system monitored and recorded by system personnel. Anyone using this system expressly consents to such monitoring and is advised that if such monitoring reveals possible evidence of criminal activity system personnel may provide the evidence of such monitoring to law enforcement officials."

responsibilities include the investigation of violations of United States criminal laws, to include procurement fraud, grant fraud, false claims, bribery, conspiracy, kickbacks, money laundering, and other violations of laws affecting the programs and functions of the DOS and USAGM. During the course of my career, I have investigated or assisted in investigations concerning public corruption, white-collar crime, computer-related crimes, passport and visa fraud, sexual assault, and other complex investigations of fraud, waste, and abuse involving government funds. I hold a Bachelor's of Arts and Master of Arts degrees from George Mason University and a Juris Doctor degree from George Mason University School of Law.

5.      The facts and information contained in this Affidavit are based upon my training and experience, personal knowledge, and observations during the course of this investigation, as well as the observations of other agents involved in this investigation. This Affidavit contains only the information necessary to support probable cause and is not intended to include each and every fact or matter observed by me or known to the government.

6.      Based on the facts set forth in this Affidavit below as well as my training and experience, I submit that there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 287 (False, Fictitious and Fraudulent Claims), and 18 U.S.C. § 1028A (Aggravated Identity Theft), have been committed by the user of the **TARGET EMAIL ACCOUNT**.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

# STATEMENT OF PROBABLE CAUSE

## Background

8.      USAGM is a government agency based in Washington, D.C. USAGM was

formerly known as the Broadcasting Board of Governors (BBG). USAGM is an independent

federal agency that seeks to inform, engage, and connect people around the world in support of

freedom and democracy. USAGM provides multimedia broadcast distribution, as well as

technical and administrative support to the broadcasting networks. It manages a global network

of transmitting sites and an extensive system of leased satellite and fiber optic circuits, along

with a rapidly growing Internet delivery system servicing all USAGM broadcasters. It is also the

administrative and marketing arm of the Agency. USAGM also oversees five networks: two

federal organizations — the Voice of America and the Office of Cuba Broadcasting, which

oversees Radio and TV Marti — Radio Free Europe/Radio Liberty, Radio Free Asia and the

Middle east Broadcasting Networks — which receive grants from USAGM.[2] USAGM, like BBG

before it, is overseen by the Inspector General of the U.S. Department of State, for whom I work

as a special agent.

9.      ULLAH was the Chief Strategy Officer ("CSO") for USAGM and had been in

that position since October 1, 2017. According to his on-line biography, ULLAH "leads the

Agency's policy engagement within the broader U.S. government as well as with key

stakeholders outside the federal government. The CSO focuses on strategic planning and

initiatives to make the Agency more strategically relevant in the national security, foreign affairs,

and global media spheres."[3] Before joining USAGM, ULLAH had been employed with the U.S.

---

[2] *See* https://www.usagm.gov/who-we-are/organizational-chart/ (last visited January 24, 2019).

[3] *See* https://www.usagm.gov/who-we-are/management-team/ (last visited January 24, 2019).

Department of State since 2010. ULLAH holds a Ph.D. degree, is a published author, and is a recognized expert in countering violent extremism.

10.     In his capacity as CSO for USAGM, ULLAH was authorized to travel by USAGM at government expense only for official business. Such official travel for ULLAH's trips was arranged and authorized via E2 Solutions ("E2").

11.     E2 Solutions ("E2") is an end-to-end web-based travel and expense management tool which provides a way to create and track travel authorizations, get approvals, submit vouchers, receive reimbursements, and book travel reservations. E2 is supplied by Carlson Wagonlit Travel SatoTravel, which provides global corporate travel services for various government agencies, including USAGM and DOS. A traveler initiates a trip in E2 by creating an authorization, which states the dates of travel and the purpose of the travel. When the traveler creates the authorization, the traveler also books travel and a unique trip number is generated to capture a record of the authorization and reimbursement process for that particular trip. Within E2, travelers have approvers for authorizations and vouchers. In my experience with E2, approvers are usually supervisors or within the chain of command of travelers. Once travel is completed, travelers submit vouchers and supporting documents to E2 for payments and/or reimbursement.

12.     Only official travel can be booked through E2. With every voucher submitted in E2, USAGM travel policy states, "BBG may only reimburse travelers for expenses that are essential and necessary for the conduct of official business." USAGM policy also states, "BBG will disallow payment of a claimed expense if the item is not an official expense, is not supported by documentation (such as a receipt or log), or is an unreasonable amount (such as a taxi from BBG DC to National Airport for $74.99)." Travelers also are not permitted to list for

reimbursement costs covered by a third party. For example, if lunches or dinners are paid for as part of a conference, travelers are to remove them from their voucher. E2 provides a mechanism for travelers to deduct such expenses.

13.     ULLAH sought administrative assistance from USAGM staff to arrange his travel and to submit his vouchers into the E2 system for reimbursement by providing them with the receipts from his travel. Within E2, travelers are required to certify that the vouchers and documents they submit are true and accurate and that the traveler has not previously received payment for the expenses. Because ULLAH had administrative staff submit his vouchers within E2, the staff printed out the voucher along with the receipts and the certification form for ULLAH to sign in hard copy. ULLAH signed the certification form for each of his closed vouchers in E2.[4]

14.     ULLAH's approvers stated in interviews with me that they began questioning ULLAH's authorizations because they were frequently scheduled within days of the proposed travel and the reasons for travel were listed vaguely as "meetings." After a period of time, ULLAH's approvers requested him to provide more detail for his authorizations. As a result, some of ULLAH's latter travel authorizations included email correspondence from ULLAH providing more detail for the purpose of the travel.

15.     In or around September 2018, USAGM travel personnel questioned purported Sheraton and Marriott hotel invoices that ULLAH had submitted for reimbursement through E2 for official travel to Chicago and New York. USAGM travel personnel noted that the hotel invoices did not appear to be true Sheraton and Marriott invoices, due to the formatting and content. Moreover, the amount billed for the room in New York was suspicious because the

---

[4] The certification contained the following language, "this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me."

typical taxes and fees in New York City appeared to be incorrectly calculated. USAGM

personnel contacted the hotels and sent them copies of the suspicious invoices that ULLAH had

submitted. Hotel personnel confirmed that ULLAH had not stayed at either hotel on the dates

indicated; that the hotel invoices ULLAH had submitted did not match hotel-issued invoices; and

that the hotel had not produced the invoices submitted by ULLAH.

16.     I obtained these suspicious invoices from USAGM for further investigation. I

have reviewed them. I requested from the hotels examples of true and correct invoices that they

would have issued a traveler. I also obtained all the hotel invoices submitted by ULLAH to

USAGM for reimbursement. I contacted these hotels as well to confirm the authenticity of the

invoices; whether ULLAH had stayed at their hotels; and to obtain examples of true and accurate

invoices in the instances the invoices submitted by ULLAH were fabricated. My conclusion from

my investigation is that ULLAH fabricated eleven (11) invoices he submitted to USAGM for

reimbursement, as further discussed below.

17.     On October 22, 2018, I interviewed ULLAH regarding his travel. ULLAH said

his travel was "Just mostly work-related." When shown invoices for hotels submitted with his

vouchers, ULLAH stated, "That's probably what I turned in." ULLAH also confirmed that

handwriting, which appeared on some of the hotel invoices, was his handwriting.

18.     Immediately after I interviewed ULLAH, USAGM placed ULLAH on paid

administrative leave, on which he remains as of this writing. When ULLAH was placed on leave,

his official phones and computers were taken from him and he was walked out of the building.

On or around October 22, 2018, USAGM personnel imaged the **TARGET EMAIL**

**ACCOUNT**, thus preserving it. ULLAH has not had access to the **TARGET EMAIL**

**ACCOUNT** since he was placed on administrative leave. For these reasons and those stated below, I believe relevant evidence remains in the **TARGET EMAIL ACCOUNT**.

Overview of Manner and Means of ULLAH's Scheme to Defraud

19.     ULLAH devised a scheme to defraud USAGM of money and property by submitting for reimbursement falsified hotel invoices; falsified taxi receipts; double-billing sponsors and USAGM for the same trips; and billing USAGM for what appear to be personal trips, either to promote his book, or for week-end trips during which no USAGM business was likely conducted. Also, ULLAH submitted to USAGM a falsified and forged letter from a real medical doctor claiming that ULLAH required an upgrade to business class because of a medical condition. The doctor confirmed that the letter was a forgery; that he did not authorize ULLAH to use his identity; and that a business class upgrade for ULLAH's sore knee was not medically necessary. By stealing the doctor's identity, ULLAH, thus, also defrauded USAGM of all payments for business class upgrades, some of which were substantial, as they involved international flights. Altogether, based on a preliminary review of his travel records, it appears that ULLAH defrauded USAGM of at least $25,000, and committed aggravated identity theft in so doing.

20.     Based upon my analysis of the falsified and fraudulent documents that ULLAH submitted to USAGM for reimbursement, it appears that he used various techniques to create hotel, Uber and taxi receipts. With some hotel invoices, ULLAH seems to have obtained logos of hotel chains and pasted them onto a document along with what appears to be Excel spreadsheets to create hotel invoices. With other hotel invoices, it appears he took a legitimate hotel invoice and changed his address or other data, possibly to conceal the hotel room had been paid by a third-party. It is possible he also obtained invoice creation software to create these invoices. In

8

the case of an Uber receipt, it looks like ULLAH cut-and-pasted different parts of different Uber receipts to create one receipt. It also seems ULLAH obtained taxi card receipts from different taxi companies across the country and then photocopied them, submitting handwritten amounts, despite having Uber receipts for the same travel dates and routes, at substantially lower cost. Illustrative examples of the crimes are discussed in more detail below.

### Trip #9018448 – Boston, Massachusetts – February 21-23, 2018

21.     ULLAH submitted a voucher to USAGM for E2 Trip #9018448 for travel to Boston from February 21 to February 23, 2018 for the purpose of meeting with "Digital Democracy" and "data teams" on BBG. As stated above, official travel arranged through E2 must be business-related to the USAGM mission. In fact, I later learned that ULLAH had reached out to the World Affairs Council for Western Massachusetts (hereafter "WACWM") to speak at one of its events to promote the release of ULLAH's new book. Records that I received from WACWM indicated that ULLAH was working with a publicist and that copies of his new book would be sold at the event. From its website, I located the presentation ULLAH gave on February 21 at the WACWM.[5] I believe it is probable that the **TARGET EMAIL ACCOUNT** will have further evidence that this trip to Boston was not for official USAGM business, but for ULLAH's personal business.

22.     In addition to the questionable purpose for the trip, evidence indicates that ULLAH submitted falsified taxi receipts to inflate the value of his reimbursement claim. For this trip, in order to obtain reimbursement for expenses, ULLAH provided to USAGM what appear to be photocopies of taxi cards with an area code of "408," which is an area code in California.

---

[5] "How Do We Stop the Next World War: The Weaponization of Information and the Fight for Cyber Supremacy," *See* https://worldaffairscouncil.com/?page_id=231 (last visited January 24, 2019).

Both receipts were for travel within the Washington, D.C. metro area (to and from ULLAH's residence in Arlington to Reagan National Airport). The first taxi receipt has "$75" handwritten in the total amount and handwritten next to the photocopy of the taxi card is "Feb. 21, 2018 home to Airport." The second taxi receipt has "$78" handwritten in the total amount and handwritten next to the photocopy of the tax card is "Feb. 23, 2018 Airport to home." Based on my review of Uber receipts ULLAH submitted under a separate reimbursement outside of the E2 system, I believe that ULLAH falsified these two taxi receipts.

23.     As indicated, ULLAH submitted Uber receipts under a separate reimbursement procedure. Within the federal government, there is a mechanism to receive reimbursement for work-related expenses not related to travel. The mechanism used by federal employees, including those working for USAGM, is the Standard Form 1164 "Claim for Reimbursement for Expenditures on Official Business." Such expenditures would be for items like taxi rides to and from an official meeting or parking fees when attending an official event. ULLAH submitted a Standard Form 1164 dated September 6, 2018 (hereafter "September SF 1164"), which included Uber receipts from February 21, 2018 until June 27, 2018. The September SF 1164 was submitted completely separately from any voucher submitted through E2. It was in short, a claim with many receipts covering three months of miscellaneous expenditures supposedly related to work.

24.     With the September SF 1164, ULLAH submitted an Uber receipt dated February 21, 2018 in the amount of $12.70. The trip was from 2498 Army Navy Drive, Arlington, Virginia (which is a cross road near ULLAH's residence at the time on 26th Street in Arlington) to 4 South Smith Boulevard in Arlington, which is located on the property of Reagan National Airport. Uber recorded the pick-up time as 6:05 a.m. and the drop-off time as 6:12 a.m.

According to E2 travel records, ULLAH's flight was scheduled to depart at 7:30 a.m. from Reagan National Airport.

25. With September SF 1164, ULLAH submitted an Uber receipt dated February 23, 2018 in the amount of $14.72. The trip was from 4 Aviation Circle in Arlington, which is also located on the property of Reagan National Airport to ULLAH's residence at the time on 26th Street in Arlington. Uber recorded the pick-up time as 9:50 a.m. and according to E2 records ULLAH's flight from Boston was scheduled to land at 8:51 a.m.

26. I also obtained ULLAH's Uber account records directly from Uber. ULLAH's Uber submissions on the September SF 1164 form appear to match the records I obtained from Uber, and thus, represent the true cost of the rides. Those Uber records provide a time stamp, a map and address of pick-ups and drop-offs. Based on my comparison of the Uber records against the official travel and the taxi receipts that ULLAH submitted to USAGM for E2 reimbursement, I believe ULLAH submitted materially falsified taxi receipts in order to inflate his reimbursement claim. I have conducted similar analysis of ULLAH's other official trips billed through E2, comparing the Uber records against taxi receipts he submitted for official reimbursement. I am confident that the same pattern repeats itself in a number of other trips during the relevant time period.[6]

27. The voucher for this trip to Boston was approved on March 28, 2018. To the best of my belief, USAGM sent by electronic draft $1,012.76 to ULLAH's bank account.

---

[6] For instance, for E2 Trip #9063858-2 (Austin, Texas, from March 8, 2018 to March 14, 2018), ULLAH submitted two of the same type of taxi receipts with the 408 area code as discussed in this section, for rides to and from home to Washington Dulles Airport, for $76.00 and $7800 respectively. Again, the Uber receipts show the actual trips to have cost less.

**Trip #9102190-1 – Chicago, Illinois – March 23-25, 2018**

28.     For E2 Trip #9102190-1, ULLAH stated in the Travel Authorization that he

would be traveling from March 23, 2018 to March 25, 2018 to Chicago, Illinois, with the official

purpose of "Meeting in Chicago OIF." I have been unable to determine what "Chicago OIF"

means. Moreover, these dates fell on a weekend. To date, I cannot confirm any official meeting

ULLAH had in Chicago. I believe there is probable cause that the **TARGET EMAIL**

**ACCOUNT** may contain communications indicating the true purpose of ULLAH's travel to

Chicago; whether a third party paid for his travel expenses; and it may contain further evidence

of ULLAH's creation of a falsified Sheraton hotel invoice, as discussed below.

29.     ULLAH provided to USAGM an invoice allegedly from Sheraton Chicago

O'Hare Airport for the dates of March 23, 2018 to March 25, 2018 in the amount of $254.87. As

discussed above, representatives of the Sheraton Chicago O'Hare Airport stated to USAGM

personnel that the invoice ULLAH submitted was not a valid document from the hotel and that

ULLAH had not stayed at the hotel on the dates listed. As discussed above, I also obtained

examples of a true Sheraton Chicago O'Hare Airport invoice that the hotel would have issued to

a traveler, and I have verified that the invoice ULLAH submitted does not match the true format

that the hotel used.

30.     ULLAH submitted to USAGM what appear to be the same taxi cards with the

"408" area code as mentioned above. For the first taxi receipt, handwritten in the total amount is

"74" and written next to the receipt is "Home to Airport taxi Chicago trip." Uber records show a

trip dated March 23, 2018 from 1623 Army Navy Drive in Arlington to 2 Aviation Circle in

Arlington (which is located on the property of Reagan National Airport) in the amount of $12.22.

31.     ULLAH also included a taxi receipt with "$76" handwritten in the total amount and written next to the receipt is "Airport to Home Chicago trip." Uber records show a trip dated March 25, 2018 beginning at 2401 South Smith Boulevard in Arlington, which is located on the property of Reagan National Airport. The trip ended at 1243 South Eads Street in Arlington, which was near ULLAH's residence at the time on 26th Street. The amount of the Uber trip was $13.76. ULLAH also submitted this Uber receipt in the September SF 1164, mentioned above.

32.     The voucher for E2 Trip #9102190-1 was approved on July 25, 2018, and to the best of my knowledge and belief, USAGM sent by electronic funds transfer $661.87 to ULLAH's bank account of record.

### Trip #9299972-3 – Cologne, Germany – June 10-13, 2018

33.     For E2 Trip #9299972-3, ULLAH stated he would be traveling to Cologne, Germany from June 10, 2018 to June 13, 2018. The purpose of the official travel was listed as "Deutsche Welle Global Media Forum."

34.     It was during this trip that ULLAH emailed USAGM personnel via the **TARGET EMAIL ACCOUNT** to request a waiver for an upgrade to Business Class for his return flight to the United States. ULLAH claimed that he had a medical condition which required him to have extra leg room on his return flight to the United States from Germany. USAGM personnel informed ULLAH that he could pay for the upgrade and would be reimbursed once he provided a doctor's note requiring the medical accommodation.

35.     ULLAH later provided USAGM with a letter allegedly written by a true medical doctor on "The Bone and Joint Center" letterhead. The letter stated that ULLAH had a degenerative knee condition known as patella tendonopathy and for flights longer than one hour in duration he was to "lie flat."

36.     On November 15, 2018, I interviewed the doctor at his practice location in the Eastern District of Virginia. He stated that he was not with "The Bone and Joint Center" and that he had not written the letter that ULLAH submitted to USAGM. He said the signature on the false letter was not his and that he would never require an accommodation of business class air travel for such a patient. The doctor knew ULLAH personally and had seen him once or twice as a patient. The doctor stated that it was not medically necessary for ULLAH to travel in business class, and that he had never given ULLAH permission to sign his name or use his identity in furtherance of a reasonable accommodation or any claim for reimbursement from the government for travel expenses. I obtained examples of the doctor's true practice group letterhead and his true signature. A comparison of the true documents against what ULLAH submitted to USAGM indicates that ULLAH forged the doctor's signature and created a false document mixing true and fabricated information. I found the doctor to be credible.

37.     ULLAH submitted a credit card receipt dated June 11, 2018 in the amount of $1,040.00 and a credit card receipt dated June 12, 2018 in the amount of $599.00, both for business class upgrades as part of his voucher for Trip #9299972-3.

38.     The voucher for Trip #9299972-3 was approved on July 23, 2018 and to the best of my knowledge and belief USAGM sent via electronic funds transfer $2,829.68 to ULLAH's bank account of record.

### Trip #9431001 – New York, New York – July 13-15, 2018

39.     For E2 Trip #9431001, ULLAH stated in the Travel Authorization that he would be traveling from July 13, 2018 to July 15, 2018 to New York City. ULLAH stated the purpose of the official travel was for "Meetings." Using the **TARGET EMAIL ACCOUNT**, ULLAH informed his approvers in E2 that he would be meeting with "Jigsaw" and a "potential partner for

14

our scaling up of polygraph."[7] But July 13, 2018 fell on a Saturday, and I have not been able to determine whether there was actually any true official purpose for the travel. I believe it is probable that the **TARGET EMAIL ACCOUNT** will contain correspondence regarding the true reason for ULLAH's travel to New York City, or the absence of a legitimate official business purpose, as well as drafts or templates of the falsified hotel invoice he submitted for reimbursement for this trip, as discussed below.

40.     For reimbursement for this trip, ULLAH submitted a hotel invoice allegedly issued by the Marriott New York Downtown for the nights of July 13 and July 14, 2018 in the amount of $774.56. A representative of the Marriott New York Downtown informed me that the invoice was not issued by the hotel and ULLAH had not stayed at the hotel.

41.     The voucher for Trip #9431001 was approved on September 24, 2018 and to the best of my knowledge and belief USAGM sent via electronic funds transfer $1,287.53 to ULLAH's bank account of record.

### Trip #9470915 – London and New York – July 29-August 6, 2018

42.     For E2 trip #9470915, ULLAH submitted a voucher for travel to London, England and New York from July 29, 2018 to August 6, 2018. ULLAH stated the purpose of the trip was for "meetings."

43.     ULLAH submitted an invoice allegedly from the St. Ermin's Hotel in London in the amount of $1,260.24. I confirmed with St. Ermin's Hotel that the invoice submitted by ULLAH was not issued by the hotel and ULLAH had not stayed at the hotel.

---

[7] Jigsaw is a division of Google. Polygraph is a data analytics company.

44.      ULLAH submitted an invoice allegedly from the Residence Inn Central Park in the amount of $745.20. I confirmed with the Residence Inn that the invoice was not issued by the hotel and ULLAH did not stay at the hotel.

45.      The travel to New York was over a weekend. To date, I have not been able to locate any "BBG partners" who met with ULLAH on these dates.

46.      ULLAH traveled in business class per the fraudulent medical waiver discussed above.

### Trip #9530503 – Geneva, Switzerland – August 16-19, 2018

47.      For E2 Trip #9530503, ULLAH stated in the Travel Authorization that he would be traveling from August 16, 2018 to August 19, 2018 to Geneva, Switzerland. ULLAH stated that the purpose of the official travel was to attend the "Concordia Media Conference."

48.      ULLAH travelled business class per the fraudulent medical waiver discussed above. The business class ticket cost USAGM $10,337.26, whereas an economy ticket would have cost substantially less.

49.      ULLAH submitted a hotel invoice allegedly from the Caux Palace in Montreux, Switzerland. A representative of the Caux Palace stated the hotel invoice submitted by ULLAH was not issued by the Caux Palace.

50.      ULLAH also submitted what he claimed to be an Uber receipt in the amount of $57.83 dated August 19, 2018. The receipt appears to be a mix of different receipts copied and pasted together because one section states the charge was $7.83 while another has $57.83. The receipt is cut and pasted into what appears to be an email header from the **TARGET EMAIL ACCOUNT**, which ULLAH provided to USAGM to support his reimbursement claim. This receipt, however, does not resemble any other Uber receipt provided by Uber directly to me, or

16

by ULLAH. Uber confirmed that there was no record of ULLAH using its services on August 19, 2018.

### Trip #9566094 – Los Angeles and San Diego, California – August 29-31, 2018

51.　　For E2 trip #9566094, ULLAH stated in an email dated August 23, 2018 to the Managing Director of USAGM that he was travelling to Los Angeles and San Diego to speak at the World Affairs Councils in both cities "to present on polygraph and raise awareness on our very good of our storytellers." He also stated that he would be traveling there to meet with "Fandango" and "other analytic folks."

52.　　ULLAH submitted an invoice from the Residence Inn in La Jolla, California.  The billing address on the Residence Inn invoice ULLAH submitted to USAGM for reimbursement was "330 Independen Wash DC," which is an abbreviated version of USAGM's billing address of 330 Independence Avenue SW, Washington, D.C. 20237. When the hotel was contacted to verify the validity of the invoice, a hotel representative confirmed that ULLAH stayed at the hotel on August 30, 2018; however, the true billing address on the hotel's copy of the invoice for ULLAH's stay was 112 West G Street, #601, San Diego, California 92101, which is the address of the San Diego World Affairs Council, not USAGM as listed on the version of the hotel invoice ULLAH had submitted for reimbursement. I confirmed with the San Diego World Affairs Council that the organization paid for ULLAH's hotel stay and that they shared the costs of ULLAH's travel with the Inland Southern California World Affairs Council. San Diego World Affairs Council also confirmed that both organizations requested ULLAH speak based upon his personal reputation and not on behalf of USAGM.

53.     Documents received from both Inland Southern California World Affairs Council and the San Diego World Affairs Council show email exchanges between representatives of the organizations and ULLAH, using the **TARGET EMAIL ACCOUNT.**

54.     I confirmed with Inland Southern California that a check in the amount of $1,033.40 was mailed to ULLAH. The organization's records show it was cashed on October 2, 2018.

### Trip #9610066 – New York, New York – September 9-10, 2018

55.     For E2 Trip #9610066, ULLAH stated in the Travel Authorization that he would be traveling from September 9, 2018 to September 10, 2018 to New York City. ULLAH stated the purpose of the official travel was for "Meetings with Affiliates." In an email to his E2 travel approvers, ULLAH stated he was going to meet with personnel from Tapestry – a media entity.

56.     I spoke with a Director of Tapestry who informed me that neither he nor other personnel from Tapestry met with ULLAH in New York. All their contact with USAGM is done through London and ULLAH is not one of their contacts. They also said they rarely meet on weekends.

57.     ULLAH submitted an invoice from the Grand Hyatt in New York in the amount of $270.92. Personnel from the Grand Hyatt stated the invoice was not issued by the hotel and ULLAH had not stayed at the hotel.

58.     For this trip, ULLAH also was to travel to and from New York via Amtrak. After the trip was completed, the USAGM travel office was notified that ULLAH transferred his ticket from his name to that of his wife. When asked in the interview with DOS OIG, why the Amtrak ticket was reissued to his wife, ULLAH responded, "I don't remember that trip exactly. It might've been that I – I don't know whether that's actually – I can look back at that and get you

the information. But I think what it was is that I probably ended up driving, so then I got an e-voucher, probably, and then, and then I, you know, she was, she was, she was traveling by train and I just had her use the e-voucher because anyone can use the e-voucher." I pointed out that the Amtrak ticket was issued by the government. ULLAH responded, "Yeah. I – that's my mistake, then, if that happened. I thought – I think what I probably should've done is changed it to get – from them to cover my – I just thought, "Okay. I'm going to – I'll pay the cost for driving up and then whatever I do, I'm going to pay for the Amtrak and then" – but that, but that, that'd by my mistake if that's what happened. I don't remember the exact incident, but if that's what happened, that's my mistake."

59.     The voucher for Trip #9610066 was approved on September 24, 2018 and to the best of my knowledge and belief USAGM sent via electronic funds transfer $434.84 to ULLAH's bank account of record.

### Trip #9636200 – Rome, Italy – September 18-23, 2018

60.     For E2 Trip #963239, ULLAH stated in the Travel Authorization that he would be traveling from September 18, 2018 to September 23, 2018 to Rome, Italy. ULLAH stated the purpose of the trip was to attend the "NATO Stratcomm Summit."

61.     ULLAH submitted a receipt in the amount of $2,650.00 dated September 14, 2018 for an upgrade to business class for his flight from Washington Dulles Airport to Rome. ULLAH submitted a receipt dated September 15, 2018 in the amount of $2,924.00 for an upgrade to business class for his flight from Rome to Washington Dulles Airport. Both requests for reimbursement for the upgrades was based upon the fraudulent medical waiver discussed above.

62.     ULLAH submitted an invoice allegedly issued by the Westin in Rome, Italy. But a representative of the Westin in Rome informed me that the invoice was not issued by the hotel and ULLAH had not stayed at the hotel.

## RELEVANCE OF THE TARGET EMAIL ACCOUNT

63.     As indicated above, the documents I have obtained from third parties indicate that ULLAH used the **TARGET EMAIL ACCOUNT** to facilitate his appearances at speaking events where his book was promoted and sold, but for which he billed USAGM as official travel. The **TARGET EMAIL ACCOUNT** was used for other travel-related purposes, and a search of the accounts is likely to reveal the true propose of the travel, or the absence of a business purpose. I also submit that there is probable cause to believe that the **TARGET EMAIL ACCOUNT** will contain invoices, receipts, and other evidence of ULLAH's travel. Likewise, it may contain templates, receipts, and communications showing the preparatory steps ULLAH took to create false documents, and otherwise will constitute evidence, fruits, and instrumentalities of the crimes described in this affidavit.

64.     I know also from training and experience that individuals, including white collar criminals, tend to maintain such records for lengthy periods of time, especially when they are engaged in ongoing or uncharged criminal conduct. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card, travel documents, telephone directories, photographs), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may

also be under the mistaken belief that he/she has deleted, hidden or further destroyed the

evidence, which, in fact, may be retrievable by trained law enforcement personnel.

## BACKGROUND CONCERNING EMAIL

65.     From my training and experience, I have learned that USAGM provides all

employees an e-mail account upon hiring. Upon creation of the account, USAGM would use

information linked to the employee's identity. The computers and servers of USAGM are likely

to contain stored electronic communications (including retrieved and un-retrieved e-mail for

USAGM employees) and information concerning employees and their use of their USAGM e-

mail account, such as account access information, e-mail transaction information, and account

application information. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

66.     A USAGM employee can also store with the provider files in addition to e-mails,

such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

e-mails), and other files, on servers maintained and/or owned by USAGM. In my training and

experience, evidence of who was using an e-mail account may be found in address books,

contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and

files.

67.     From my training and experience, I know that e-mail providers typically retain

certain transactional information about the creation and use of each account on their systems.

This information can include the date on which the account was created, the length of service,

records of log-in (i.e., session) times and durations, the types of service utilized, the status of the

account (including whether the account is inactive or closed), the methods used to connect to the

account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

68.     This application seeks a warrant to search all responsive records and information under the control of USAGM, an agency subject to the jurisdiction of this Court, regardless of where USAGM has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the employee if such communication, record, or other information is within USAGM's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

69.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further,

information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.

70.     Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

71.     In sum, based on the facts set forth in this Affidavit, I submit that there is probable cause to believe that the user of the **TARGET EMAIL ACCOUNT** did commit wire fraud, in violation of Title 18 U.S.C. § 1343; aggravated identity theft, in violation of Title 18 U.S.C. § 1028A; and submitted false claims, in violation of 18 U.S.C. § 287. Thus, I respectfully request the issuance of a Search Warrant for the **TARGET EMAIL ACCOUNT**.

## REQUEST FOR SEALING ORDER

72.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, and that

USAGM be ordered not to disclose the existence of the search warrant to the account

user, as articulated in the government's separate application. Premature disclosure would

reveal an ongoing criminal investigation that is now neither public nor known to the

target of the investigation. Were ULLAH to learn prematurely that the investigation is

criminal in nature, he may attempt to delete or destroy other evidence, or to influence

witnesses improperly.

Respectfully Submitted,

Lisa Warffeli
Special Agent
United States Department of State Office of the
Inspector General

Subscribed and sworn to before me
this 11th day of February, 2019.

_____ /s/ _____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with the following email account:

**hullah@usagm.gov (formerly hullah@bbg.gov)**

which is stored at premises controlled by USAGM, a government agency headquartered at 330

Independence Avenue SW, Washington, D.C. 20237.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by USAGM ("USAGM")**

For the account listed in Attachment A, to the extent that the information described in

Attachment A is within the possession, custody, or control of USAGM, including any e-mails,

records, files, logs, or information that has been deleted but is still available to USAGM, or has

been preserved since approximately October 30, 2018, USAGM is required to disclose the

following information to the government for the period of account inception to the present:

a.    The contents of all electronic communications associated with the account,

including stored or preserved copies of e-mails sent to and from the account, draft e-mails, files,

all attachments to emails and other communications (including the native files), the source and

destination addresses associated with each communication, all email header information, the date

and time at which each e-mail was sent, and the size and length of each e-mail;

b.    All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP

address used to register the account, log-in IP addresses associated with session times and dates,

account status, alternative e-mail addresses provided during registration, methods of connecting,

log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All device information associated with the account;

e.      All records or other information stored at any time by an individual using the

account, including address books, contact and buddy lists, chat lists, calendar data, pictures, and

files;

f.      All records pertaining to communications between USAGM and any person

regarding the account, including contacts with support services and records of actions taken.

g.      For all information required to be disclosed pursuant to this warrant, the physical

location or locations where the information is stored.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence

and instrumentalities of violations of wire fraud (18 U.S.C. § 1343), aggravated identity theft

(18 U.S.C. § 1028A), and false claims (18 U.S.C. § 287), involving HAROON K. ULLAH and

any other co-conspirators, including, for the email account listed on Attachment A, information

pertaining to the following matters:

a.      The email and information will contain evidence that ULLAH is involved in

defrauding the United States through the submission of fraudulent vouchers, falsified supporting

invoices, receipts, and letters, as described in the Affidavit in support of probable cause.  The

account will contain evidence of communications between ULLAH, USAGM, and third parties

in furtherance of his wire fraud, false claims and identity theft schemes;

b.      Information relating to templates, receipts, communications, logos, photos,

bitmap files, and other fragments of documents and document history showing the preparatory

steps ULLAH took to create false documents;

2

c.      Information relating to the use of the criminal proceeds, the creation and maintenance of financial accounts, financial transfers and transactions, the possession of monetary instruments, the disbursement of funds;

d.      Information related to hotel invoices and/or reservations, travel plans, taxi receipts, ridesharing receipts, airline tickets, airline receipts, vehicle rental agreements, or other documents pertaining to any airline U.S. or foreign-based;

e.      Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts;

f.      Evidence indicating the email account holder's state of mind as it relates to the crime under investigation;

g.      Information that would link the email account to other email accounts controlled by the subscriber;

h.      Evidence indicating how and when the email account was accessed and used, including IP logs, passwords, geo-locational information or other records that will help establish the location of the account user.